IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JUDY A. FORD,
        Plaintiff,

v.                                   Civil Action No. 1:05CV110
                                        (Judge Keeley)

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"),

42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on the parties' cross Motions

for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for

submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B);

Fed. R. Civ. P. 72(b).

## I. Procedural History

Judy A. Ford ("Plaintiff") filed an application for DIB on January 28, 2002, alleging

disability beginning August 2, 2000, due to depression, asthma, high blood pressure, and arthritis

94, 122). The claim was denied at the initial and reconsideration levels and a hearing was timely

requested (R. 66, 74). Administrative Law Judge Barbara Gibbs ("ALJ") held a hearing on January

14, 2003 (R. 304). Claimant, represented by counsel, appeared and testified, as did her husband

James Ford, and Vocational Expert Tim Mahler ("VE"). The ALJ issued a decision denying benefits

on March 28, 2003 (R. 63). On January 9, 2004, the Appeals Council remanded the claim back to

the ALJ (R. 65). A second hearing was held on June 17, 2004, but was continued by the ALJ with

direction to submit a listing of Plaintiff's past employment history (R. 363). A third hearing was

held on October 13, 2004 (R. 369). At that hearing, Plaintiff, again represented by counsel, testified,

as did her husband and daughter-in-law and VE Tim Mahler (R. 370). On December 7, 2004, the

ALJ issued a decision finding Plaintiff was not disabled at any time through the date of his decision

(R. 22). On May 27, 2005, the Appeals Council denied Plaintiff's request for review (R. 6),

rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Judy Ford ("Plaintiff") was born on November 18, 1944, and was 58 years old when she

originally filed her claim, and 61 years old at the time of the ALJ's decision (R. 94). She left school

in the 11th grade to get married. She received fair grades in school but did not participate in activities

(R. 170). She did not obtain her GED. She worked for the most part as a housekeeper at hotels or

state parks. She last worked on August 2, 2000, when she walked off her job as a housekeeper at

a state park.

On October 5, 1995, Plaintiff presented to her treating physician, Dr. David B. Bender, M.D.

with complaints of fatigue (R. 299). She stated she had felt tired and weak with pain between her

shoulders for the past year. It worsened over the summer and she quit her job as a hotel maid

because she was unable to keep it up. She stated at times she felt like she was losing her mind

because she "just ached all over." She was going through menopause. She quit taking hormones

a year earlier stating they did not help. She denied headaches, dizziness, muscle weakness, joint

erythema and swelling. She did report trouble sleeping. She described feeling worthless since no

longer employed and "took moods" several times a week with crying spells plus anhedonia, where

she would just sit and stare into space or go to bed. Her asthma had been stable. Dr. Bender

diagnosed fatigue most likely due to depression, asthma– stable, and menopause–needs to restart hormone treatment.

One month later, Plaintiff presented to the emergency room complaining of pain in her back and ribs when taking a deep breath (R. 298). She also still felt "somewhat anxious" and wanted to start hormone pills again. Her sleep was better. Her affect was fairly normal. She was not crying and she made good eye contact. She was diagnosed with perimenopausal syndrome, intercostal strain/degenerative joint disease ("DJD"), and asthma.

In January 1996, Plaintiff told Dr. Bender her asthma had been "ok" that winter (R. 297). She stated she was depressed at times– her moods were "so-so" depending on the day. Some days she felt like shaking all over. Her eyes were slightly downcast today. Her eye contact was decreased. She had a slight tremor in her hands. Dr. Bender diagnosed reactive airways disease[1] ("RAD") – stable, depression – stable, hypercholesteremia, borderline hypertension, and menopause.

On April 1, 1996, Plaintiff reported her sleep was fair with increased arthralgias in her right hand (R. 296). Upon examination her right hand had tenderness over the PIP joints. She was diagnosed with DJD, depression-stable, RAD–stable, and menopause.

On July 22, 1996, Plaintiff complained of one episode of RAD– now resolved, and nerves that were "sometimes bad" (R. 296). The diagnosis was depression, DJD stable, and RAD stable.

On September 17, 1996, Plaintiff complained of upper respiratory symptoms with cough (R. 295). She was sleeping a lot. Her arthritis was fair. Her affect was flat. She was diagnosed with RAD, depression, and increased cholesterol.

---

[1]Any of several conditions characterized by wheezing and allergic reactions; the most common ones are asthma, bronchiolitis, and chronic obstructive lung disease. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 541 (30th ed. 2003).

On November 4, 1996, Plaintiff followed up regarding her depression and anxiety. She reported Zoloft helped. She was diagnosed with depression/anxiety and asthma–stable.

On April 14, 1997, Plaintiff complained her arthritis was fair on medication. She was diagnosed with RAD, depression, DJD and high cholesterol.

On April 24, 1997, Plaintiff complained of sporadic chest pains when rising or moving (R. 294). She was diagnosed with chest pain due to muscular spasm.

On July 21, 1997, Plaintiff complained of a recent upper respiratory infection with productive cough now resolving, arthritis fair, and mood ok. Her affect was normal. She was diagnosed with anxiety/depression, RAD, DJD, and high cholesterol.

On June 16, 1998, Plaintiff stated her breathing was good and she was doing well on her hormones. She had stopped taking Zoloft, but said her mood was good. The DJD in her hands was worse. Upon examination she had increased tenderness in her right hand. She was diagnosed with RAD, titubation of Zoloft resolved, DJD, and increased cholesterol.

On February 16, 1999, Plaintiff presented to the hospital with upper epigastric pain that radiated into her neck and back (R. 257). Nitroglycerine did not relieve the pain, but a G.I. cocktail did. She was admitted for observation to rule out myocardial infarction. Plaintiff denied any other medical problems other than "some arthritis pain." The diagnosis was chest pain, rule out myocardial infarction "although it is likely gastritis."

The next day Plaintiff stated she had some vague epigastric pain and felt nauseated (R. 257). She was diagnosed with epigastric pain, likely secondary to gastritis.

On February 27, 1999, Plaintiff presented to the hospital with complaints of shortness of breath (R. 255, 264). A chest x-ray showed increased interstitial markings, consistent with an

interstitial edema or interstitial pneumonitis.

On March 3, 1999, Plaintiff followed up with Dr. Bender regarding her pneumonia (R. 291). She stated she was feeling better, with no fever, but felt weak. Upon examination, she had scattered wheezes throughout her lungs, but no crackles. The diagnosis with pneumonia, clinically stable, and COPD.

One week later, Plaintiff stated she still felt weak with a minimal cough and hoarse voice. She also reported having gone to the hospital for chest pain, which was assessed as due to GERD. She also reported having quit smoking one month earlier. She was diagnosed with pneumonia, stable, COPD, and GERD.

A chest x-ray on March 15, 1999, showed thickening of the minor fissure, but no infiltrate, pulmonary edema, pleural fluid, or pneumothorax (R. 263).

On April 19, 1999, Plaintiff requested a further GI workup to make sure she did not have an ulcer (R. 290). She complained of epigastric soreness. Her breathing was good. She was diagnosed with GERD and RAD.

An Upper GI on May 5, 1999, showed hiatal hernia and GERD (R. 262). No ulcer was detected.

On May 24, 1999, Plaintiff saw Dr. Bender for a follow up of her GERD (R. 289). She was still having symptoms despite Prilosec. She also complained of worsening arthritis discomfort. Plaintiff's physical examination was unremarkable. She had had an upper GI which indicated GERD with hiatal hernia and a positive H-Pylori antibody. She was diagnosed with H-Pylori GERD and DJD.

One month later, Plaintiff reported her stomach and arthritis were both "good" (R. 289). She

was diagnosed with GERD and DJD.

Plaintiff injured her left foot at work in late June 1999 (R. 261). X-rays showed no fracture and normal alignment, but some soft tissue swelling.

On July 6, 1999, Plaintiff reported to Dr. Bender regarding her left foot (R. 288). She complained of leg and ankle pain. X-rays were negative. She had stayed off the foot, but the pain and swelling were worse than one week earlier. Upon examination, her left leg was swollen around the ankle, foot, and lower 1/3 of the leg. There was positive bone pain/tenderness. She had good flexion and extension of the ankle. Dr. Bender diagnosed a sprain/contusion of the left ankle and leg. He advised her to stay off work for six more days.

On July 19, 1999, Plaintiff still complained of pain in her left ankle. X-rays were still negative. Upon examination, she had tenderness and edema in the lower part of her leg. The diagnosis was left ankle pain. Dr. Bender advised a bone scan.

A bone scan completed on July 30, 1999, indicated vague increased activity in the left ankle, but not of the intensity to suggest a fracture (R. 259). No other abnormalities were seen.

On August 9, 1999, Plaintiff still complained of pain in her ankle, worse with movement (R. 287). Upon examination, she still had tenderness and edema. The bone scan and x-rays were all negative for fracture. The diagnosis was ankle sprain, slow to resolve. Dr. Bender ordered an MRI, and ordered her off work for two more weeks.

On August 25, 1999, Plaintiff had not yet had the MRI done (R. 287). She reported still having pain and swelling. Celebrex helped the pain. She was keeping her leg up, but it had not improved. She was diagnosed with ankle sprain, slow to resolve, and again advised to get an MRI. She was to be off work for two more weeks.

An MRI of the left ankle showed a small joint effusion and swelling, but no tendon rupture.

On September 8, 1999, Plaintiff stated she felt that nothing had improved except flexibility (R. 286). She still had pain and swelling. She was frustrated with disability and wanted to return to work. She had gone to physical therapy three times. Upon examination, her left foot was tender but with less edema. She was diagnosed with ankle sprain, slow to resolve, and given a return to work slip for a trial period after one week.

On September 27, 1999, Plaintiff stated she worked for four days, but still had soreness, tenderness, and edema. Upon examination, there was tenderness diffusely over the ankle but less edema. Range of motion was normal. The diagnosis was status post ankle sprain. She was advised to continue conservative treatment with ice and an ace bandage or high top shoe.

On June 15, 2000, Plaintiff had no complaints (R. 285). Her GERD was good, her DJD was fair, and her asthma was ok. The diagnoses was GERD, DJD, and asthma. Dr. Bender continued her medications.

Plaintiff's last day of employment was August 2, 2000, when she walked off the job in the middle of the day (R. 311, 312).

On December 14, 2000, Plaintiff presented to Dr. Bender, "to discuss how she is feeling" (R. 207). Plaintiff reported her arthritis was worse, but her stomach was good. She was diagnosed with GERD, DJD, and hypertension, and given prescriptions for arthritis and high blood pressure.

On December 26, 2000, Plaintiff reported her blood pressure was "up and down," her head was "thumping," and "she thinks she needs something for nerves" (R. 206). She complained of "situational anxiety" because her mother was living with her. Her blood pressure was still elevated. She was prescribed an additional high blood pressure medication and Xanax for situational anxiety.

On February 6, 2001, Plaintiff complained of a lump on the left side of her neck for one day,

along with generalized fatigue, occasional dizziness, and her head feeling full for two months (R. 205). She was diagnosed with hypertension–stable; DJD–stable; GERD–stable, and chronic sinusitis.

On March 12, 2001, Plaintiff presented to her doctor to discuss the fact that she was doubling the amount of Prevacid, but still had heartburn. She had not taken her hypertension medication that day (R. 204). Her doctor switched her GERD medication to Nexium, and impressed on her the importance of her blood pressure medication. He found her DJD was stable. About one week later, Plaintiff reported the Nexium was not helping, and switched back to Prevacid.

Plaintiff's next visit to her doctor was eight months later, on November 13, 2001 (R. 203). She complained of right-sided numbness for 30 minutes about two weeks earlier, with intermittent symptoms and some blurred vision since. She was diagnosed with high cholesterol, GERD, DJD, possible TIA, right upper quadrant pain, and depression, for which she was prescribed Celexa.

On January 2, 2002, Plaintiff reported her mood was improving and abdominal pain was decreasing (R. 202). She had not had any further episodes of numbness. Her doctor diagnosed depression, possible carotid stenosis, abdominal pain, hypertension, and high cholesterol.

Plaintiff completed an Adult Disability Report on January 28, 2002, stating her limitations were due to depression, asthma, high blood pressure, and arthritis (R. 122). She stated she had worked after these conditions first bothered her, but that when she had an asthma attack, other employees would help. She also stated her depression made it hard for her to get along with co-workers as well as her husband and children. She thought everyone was against her. She stated she stopped working in August 2000, because she "could not get along with people [and] was not doing [her] job because [she] was depressed and afraid to drive" (R. 122). In her Activities of Daily

Living, Plaintiff stated she did not sleep at night and took naps during the day because she just did not like being awake or around anyone (R. 136). She stated she did not go out, but her children visited five times a week (R. 139). She only left the house to go to the doctor. She did not want to be around anyone, and would "take things the wrong way and get real angry" (R. 139).

On March 5, 2002, Plaintiff presented to her doctor stating she had applied for disability and that her arthritis medication was causing gastrointestinal upset (R. 202). She complained of stomach discomfort due to medication. She stated her mood was ok. She was diagnosed with abdominal pain, questionable TIA, high cholesterol, hypertension, and DJD.

On March 27, 2002, Plaintiff underwent an Independent Medical Examination, performed by Kip Beard, M.D. at the request of the State Disability Determination Division (R. 161). Plaintiff's chief physical complaints were listed as arthritis, back pain, and asthma. She said she was diagnosed with asthma 10 years earlier, but did not have attacks too often since she quit work. She could not recall her last asthma attack. She had not been hospitalized due to asthma. She did use inhalers, but mentioned no constant shortness of breath or limitation with dyspnea on exertion, but had a cough "on occasion" that was more productive when she had a cold. She had intermittent wheezing and smoked less than a pack of cigarettes per day.

Plaintiff reported having hypertension for three years, and felt like she had a "head full of air" when her pressure was up. She had never been hospitalized for this.

Plaintiff also complained of neck and upper back pain, stating she hurt between the shoulder blades, radiating up to her neck. The pain was intermittent and to waxed and waned. Mid back pain could be made worse by bending, stooping, sitting, lifting, riding in a car, and standing. Neck pain was made worse by turning her head too far or too rapidly. She did not use a brace. She applied heat

9

and took Celexa for pain. Plaintiff stated she also had arthritis in her hands, wrists, shoulders, hips, knees, ankles, and feet, but mostly in her hands – particularly the thumbs. She had tenderness in all regions and occasional swelling in the right knee. She had intermittent pain associated with use and weight bearing activity, and stiffness that could occur throughout the day. Dampness increased her symptoms. She did not use ambulatory aids or braces. She was currently taking Vioxx, Diovan, Zocor, Prevacid, AeroBid, Prempro, and Celexa.

Upon examination, Plaintiff could stand without assistance and ambulated without a limp (R. 163). She appeared to have no difficulty arising from a seated position or climbing up or down from the examination table. She appeared comfortable while seated, but mildly uncomfortable while supine. There was no tenderness over the cervical spinous process but there was paravertebral and trapezius tenderness. There was no evidence of paravertebral muscular spasm. Cervical spine range of motion for flexion was normal, but extension, lateral bending, and rotation were diminished. The shoulders, elbows and wrists were non-tender. Shoulder range of motion was diminished. The elbows and wrists were normal. Plaintiff's hands revealed tenderness and mild swelling, but full range of motion in all joints of the fingers of both hands. She could make a fist bilaterally. There were no Heberden or Bouchard's nodes. She could button and pick up coins with either hand. She had crepitation of the knees. Extension of the knees was normal. The feet and ankles were non-tender with no redness, warmth or swelling. Range of motion was normal.

The dorsolumbar spine revealed increased dorsal kyphosis with spinous process tenderness (R. 165). There was no evidence of paravertebral muscular spasm. She could stand on one leg at a time without difficulty. Seated straight leg raising was normal to 90 degrees, but supine straight leg raising was diminished (but still negative) at 75 degrees. Forward bending was normal.

10

Extension was diminished. Lateral motion was normal. There was no tenderness to palpation of the hips. Hip flexion was diminished.

There was no evidence of weakness. Sensation appeared intact. Plaintiff could walk on her heels and toes and heel-to-toe, but with complaints of knee pain. She appeared to have mild difficulty arising from a squat (R. 165).

Dr. Beard's impression was shortness of breath with reported history of asthma and history of tobacco abuse; multiple arthralgias, including possible mild osteoarthritis, and chronic neck, and upper back pain consisting of chronic cervicothoracic strain and "consider osteoporosis" (R. 166). In summary, he noted that claimant had multiple joint aches with mild crepitation and diminished motion at the knees as well as findings in the thumbs and mildly diminished motion in the hips, not seemingly associated with pain. Diminished motion in the shoulders was seemingly related to back pain. She also had mild motion abnormalities without evidence of nerve root impingement or upper motor neuron lesion and increased dorsal kyphosis. An x-ray of the right hand showed osteoarthritic changes (R. 167). An x-ray of the lumbar spine was normal.

On March 29, 2002, Plaintiff underwent a psychological evaluation performed by Martin Levin, M.A. at the request of the State agency (R. 169). Plaintiff's chief complaint was that she had "spells when it feels like everyone is against me." She reportedly would get mad at everyone at these time and said she knew she was doing it but could not stop. She stated she would get angry easily and liked to go off by herself. She had trouble sleeping and was often awakened by bad dreams. Her appetite was ok. She had crying spells approximately twice a week and her mood had been depressed. She had some marginal suicidal thoughts but no attempts and did not feel she would really hurt herself. She did indicate some panic feelings and stated she did not like to go out. She

felt like "something was closing in on [her] and [she didn't] do anything anymore."

Plaintiff stated she had not had any treatment for four years, although she had been treated with antidepressants approximately 10 years earlier. She never had any kind of therapy or counseling. She denied use of alcohol or drugs, but smoked less than a pack a day, and drank a quarter of a pot of coffee per day.

Upon mental status examination, Mr. Levin noted Plaintiff was neatly and appropriately dressed and groomed; was pleasant and cooperative throughout the evaluation; made good eye contact and behaved in a socially appropriate manner; had normal speech, and was fully oriented (R. 170). Her mood was depressed and her affect labile. There were no abnormal thought processes noted, although Mr. Levin noted some delusional qualities when Plaintiff was extremely angry, accusing family embers of being against her and hearing her dead mother's voice at times. He found her insight was poor, her judgment average, her immediate memory mildly deficient, her recent memory moderately deficient, her remote memory within normal limits and her concentration moderately deficient. She obtained IQ scores of 78 verbal, 78 performance, and 76 full scale, which Mr. Levin found were overall valid (R. 171).

Plaintiff reported her daily activities as not doing much during the day, generally because she was fearful of going out or because she has become angry at family members and withdrew to her bedroom. She spent a significant amount of time there. When she felt better, she enjoyed playing with her grandchildren and visiting her daughter. Her relationship with her husband was good, but she did not engage in much social activity.

Mr. Levin diagnosed Plaintiff with Panic Disorder with Agoraphobia; Depressive Disorder, NOS; and Borderline Intellectual Functioning (R. 172). He found her concentration moderately

deficient, her persistence average, her pace average, and her immediate memory mildly deficient, her recent memory moderately deficient, and her remote memory average. She would be capable of managing her own finances.

On April 16, 2002, State agency reviewing physician Hugh M. Brown completed a Physical Residual Functional Capacity Assessment ("RFC"), opining Plaintiff could lift 50 pounds occasionally; 25 pounds frequently; could stand and/or walk about 6 hours in an eight hour workday; and sit about six hours in an eight-hour workday (R. 174). She could occasionally perform all postural limitations, and had no other limitations. Dr. Brown noted that Plaintiff complained of multiple arthralgias, but her gait, strength and range of motion were not significantly decreased.

On April 17, 2002, State agency reviewing psychologist Samuel Goots, Ph.D., completed a psychiatric review technique ("PRT"), finding that Plaintiff had Borderline Intellectual Functioning, Depressive Disorder, NOS, and a Panic Disorder. He found her degree of limitation of activities of daily living and maintaining social functioning were mild, her difficulties in maintaining concentration, persistence or pace were moderate, and she had had no episodes of decompensation, each of extended duration (R. 192).

Dr. Goots also completed a Mental Residual Functional Capacity Assessment ("RFC"), finding Plaintiff moderately limited in her ability to understand, remember, and carry out detailed instructions; perform activities within a schedule maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and work in coordination with others without being distracted by them (R. 197). He found her not significantly limited in all other areas.

Dr. Goots assessed Plaintiff as follows:

> She has a severe impairment which does not meet or equal the listings and does not substantially reduce her ability to function.
>
> She retains the capacity to understand and follow routine instructions with initial supportive supervision.

(R. 199).

On April 30, 2002, Plaintiff reported to Dr. Bender that her nausea persisted, especially with dairy products (R. 201). Her mood was fair. She reported drinking two to three beers per day. Upon exam, she had good eye contact and affect. She was diagnosed with depression, questionable lactose intolerance, GERD, and DJD. The doctor voiced concerns over her use of alcohol.

On July 10, 2002, State agency reviewing physician Thomas Lauderman, D.O. completed a Physical Residual Functional Capacity Assessment ("RFC"), finding Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand and/or walk about six hours in an eight-hour workday; and could sit about six hours in an eight-hour workday (R. 235). She could occasionally perform all postural maneuvers (R. 236). She had no other limitations. Dr. Lauderman reduced Plaintiff's RFC due to pain and fatigue (R. 239).

Also on July 10, 2002, State agency reviewing psychologist James Capage, Ph.D. completed a Psychiatric Review Technique ("PRT"), based on Borderline Intellectual Functioning, Depressive Disorder, NOS, and Panic Disorder with Agoraphobia (R. 220). He opined she would have a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (R. 230). She had no episodes of decompensation, each of extended duration.

Dr. Capage also completed a Mental RFC opining Plaintiff was moderately limited in her ability to understand and remember detailed instructions; maintain attention and concentration for

extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors (R. 215-216). Dr. Capage then stated:

> It seems that she retains the mental-emotional capacity to understand [and] follow 2-3 step instructions, to adequately interact with supervisors [and] coworkers [and] to adapt to a low-pressure work setting.

(R. 217).

On July 23, 2002, Plaintiff presented to Dr. Bender for a three- month follow-up (R. 243). She complained of some insomnia and of "not being able to go out much." Her affect was blunted and she made poor eye contact. The diagnosis was depression, insomnia, GERD – stable, and DJD– stable. The doctor added Remeron, a sleep aid. He wrote: "Unable to work [due to] depression [and] co-existant [sic] DJD."

On October 22, 2002, Plaintiff told Dr. Bender her sleep was improved but she had daytime somnolence, her DJD was poor in her hands, and her alcohol use was increasing (R. 244). Her affect was flat, but she made good eye contact. Her hands showed signs of DJD. The diagnosis was depression, hypertension, DJD, and alcohol use. The doctor increased her Celexa and Vioxx and advised her to abstain from all alcohol.

On December 17, 2002, Plaintiff told her doctor her mood had improved and the increased Vioxx was helping her DJD. She also said she had slightly decreased her alcohol consumption but

still intermittently used "to excess." Her affect was flat and tearful. She was diagnosed with major depression, hypertension and DJD. Celexa was discontinued and Lexapro was prescribed for depression.

On March 3, 2003, Dr. Bender wrote a "to whom it may concern" letter stating that Plaintiff had a history of degenerative joint disease of her back, chronic major depressive disorder, hyperlipidemia, hypertension, and gastroesophageal reflux disease (R. 246). Dr. Bender stated that Plaintiff's "disturbance of mood " had been chronic despite adequate medical intervention. She had persistent anhedonia, sleep disturbance, decreased energy, and difficulty with concentration, all causing a marked restriction in her normal activities of daily living and social functioning. He opined that her condition had caused her to function poorly outside the home "and thus she needs to live in a highly controlled environment."

Dr. Bender stated Plaintiff also had chronic DJD in her back documented by x-rays "in the distant past." He opined her arthritis was severe and caused a decrease in her normal range of motion of the spine. Activities caused spasm, which could be incapacitating. Her back symptoms had occurred over the past five to ten years with increasing severity. Vioxx helped minimally. Her back pain caused her to be unable to stand for more than 30 minutes, sit in one position for more than 60 minutes, or ambulate for more than five minutes without onset of intractable pain and frequent spasm. "This certainly limits the patient's ability to seek gainful employment and as such she is unable to work at present and this will unfortunately be a permanent condition." He concluded: "[B]ecause of the patient's multiple medical problems including major depression and degenerative joint disease of her back, she is unfortunately totally and permanently disabled."

On April 14, 2003, Plaintiff presented to Dr. Bender for a routine appointment (R. 250). She

16

reported doing "fair" with Lexapro, but still with anger and agoraphobia. Her back and legs still hurt and she could not walk or stand due to pain and spasm. She had decreased her alcohol use, and was only drinking beer. Upon examination, the doctor noted lumbosacral spine and neck had bilateral spasm and decreased range of motion and tenderness. Her affect was flat, but she made good eye contact. The diagnosis was depression, DJD and Hypertension. Her Lexapro was increased.

On July 7, 2003, Plaintiff present to Dr. Bender concerning an irritation on her right leg (R. 249). She told the doctor her mood was improved. She did have some right shoulder pain, worse with raising her arm. She was watching her diet. Upon examination her affect was normal. She was diagnosed with depression and hypertension.

On November 17, 2003, Plaintiff followed up with Dr. Bender. She reported her mood was poor again despite medication. She was sleeping ok. She also had "some nervousness." Upon examination, her affect was flat, tearful, and angry. She made good eye contact. Her back had bilateral lumbosacral tenderness. She was diagnosed with depression, DJD, GERD, and hypertension.

On January 21, 2004, Plaintiff presented to Dr. Bender for a follow up (R. 247). She complained of being dizzy for one week, along with unsteadiness. The nurse reported Plaintiff almost fell getting on the scale. The vertigo was worse with movement. Plaintiff had stopped taking Zoloft due to palpitations, but her mood was ok. Her affect was normal. The doctor found she had vertigo with head movement, hypertension, depression and GERD, and opined she was "still disabled." He kept her off Zoloft for the time being.

On April 21, 2004, Plaintiff returned to Dr. Bender for her "3 month followup" (R. 284). She had resumed Zoloft, but still had poor mood and wanted to sleep a lot. Her affect was flat, but she

made good eye contact. She was diagnosed with hypertension and depression. Her doctor discontinued Zoloft and prescribed Wellbutrin.

On June 2, 2004, Plaintiff presented to her doctor for a followup (R. 300). She said her mood was worse and she wanted to retry Lexapro. Her affect was flat. Dr. Bender diagnosed depression, and re-started her on Lexapro.

On June 15, 2004, Dr. Bender wrote that there had been no change in Plaintiff's condition since March 2003 (R. 303).

On June 15, 2004, Plaintiff's daughter-in-law wrote a letter to Plaintiff's counsel, stating that Plaintiff could not take care of her own monthly bills and that she (the daughter-in-law) did them for her (R. 158). She also stated that Plaintiff would get angry with and lash out at family members, store clerks, and strangers "if they appear[ed] to look at her the wrong way." Plaintiff had no friends, having driven them all away. She would speak to two of her daughters on the phone, but not a third, because of "harshly spoken words" between the two. The daughter-in-law explained: "Most immediate family members will tolerate her outbursts, lashing out, "Hiding" and anxiety, and if they don't tolerate it they just stay away for a while until she settles down."

The daughter-in-law also stated that she had worked with Plaintiff in 1989, and witnessed Plaintiff curse at and threaten to beat up a supervisor at that time. They were again employed together in 1990, at which time she witnessed Plaintiff curse and threaten another supervisor. On another occasion, when Plaintiff had made a mistake, she cursed at the supervisor and accused him of purposely giving her the wrong instructions. She recalled these as being only the "major" events, stating there were a number of other, more minor events that she had witnessed at work. Outside the workplace, she stated that Plaintiff once "blew up," accusing her husband and family of being

against her and having no respect for her because they wanted to go to the husband's brother-in-law's funeral. She also verbally "cussed" and threatened her sister-in-law in a Wal-Mart for no apparent reason. She had verbally attacked the writer also, who stated the outbursts "come from nowhere with no warning" (R. 159).

On August 9, 2004, Plaintiff presented for her "2 month checkup" (R. 300). Her mood was ok, she was sleeping ok, and she had more energy with the Lexapro. Her affect was good as was her eye contact.

At the administrative hearing on January 14, 2003, Plaintiff testified her last day of work was August 2, 2000 (R. 311). She walked off the job in the middle of the day. She testified "I really don't know why I walked off on my job. I just - - I know that I was hurting a lot and then the depression. I just felt like - - that the people around me was against me" (R. 311). She also testified she had not had difficulties getting along with the other people that worked with her, and that was "why I can't figure out why I just up and walked out. I mean I just felt like all of the sudden that they was against me. And I just left."

Plaintiff testified she did not do the shopping, because she did not like going out or being around people (R. 325). She was also now afraid to drive and did not drive at all anymore. She used to enjoy hunting, but her family would no longer allow her to have a gun because she had threatened to kill herself. She did not think she would be able to load the gun anymore due to the arthritis in her hands anyway. She did not go to her grandchildren's sporting events because she could not stand the crowds (R. 329). She had not been to even one of her grandson's matches.

Plaintiff testified she had begun drinking about a year earlier, because it made her feel better (R. 333). She also testified that her medications worked for awhile, but then became less effective,

and her doctor would switch her to a new one. Before she was on Celexa, she had threatened to stab and shoot her husband, and ran all her children off (R. 334). The children took all the guns and knives out of the house at that time. After she started taking Celexa she calmed down. But after a while she again could not cope with things, and the doctor switched her to Lexapro. It was helping but she still had her "moods and contrary spells," during which no one could talk to her. She described these "spells" as feeling like everyone was against her. She also testified she "threw one awful fit" when her family went to her husband's brother-in-law's funeral. She also testified she'd heard her deceased mother's voice calling her and asking her to do things for her.

Plaintiff also testified she had problems with her right hand, but could hold silverware. The left hand was not as bad. She could button larger buttons, but not small ones, and she could pick up a quarter or nickle, but usually not a penny or dime.

Plaintiff's husband, who had been sequestered during Plaintiff's testimony, then testified that her mood was terrible and that she had threatened to kill him before. He said she would get "radical" sometimes. Their son had taken all the guns out of the house because of her threats to shoot people or herself. He also testified Plaintiff hardly ever left the house and did not want to go anywhere (R. 350).

The VE testified that if Plaintiff's testimony regarding her mood swings and violent attitudes where she would withdraw, decompensate, and go by herself avoiding interacting with people were credible, there would be no jobs (R. 356). This would be so even if the problems happened only once or twice a month, as Plaintiff's husband testified. Plaintiff's counsel then noted that the State agency psychologists indicated Plaintiff would have a moderate limitation in her ability to perform within a schedule and maintain regular attendance and be punctual. She then defined moderate as

occasional, meaning up to one third of the time. She asked if those limitations would affect the jobs named. The VE testified that one would be permitted to miss only one day per month, and must be on time, finish the work schedule, and complete the tasks at hand.

At the second hearing, held on October 13, 2004 Plaintiff testified that she walked off her last job "Because I had been off sick and they seemed to think I was lying about being sick . . . . And then whenever I went to go back to work, I - - me and my supervisor had some words an - - I just left (R. 392). When asked if Dr. Bender had recommended she see a psychiatrist, she testified: "Yeah, but no. I don't like being around people to start with and I can't want to go to some stranger. And I feel like Dr. Binder [sic] - - I've been with him ever since he's been in Grafton. I just don't want anyone else" (R. 397).

Plaintiff's daughter-in-law testified at this hearing that she had known Plaintiff for 18 years, and had actually worked with her on a number of occasions (R. 373). She testified that Plaintiff would usually start out "ok" with a job, but "it usually ended up in a violent ending at every job, whether it would be verbal or physical or just very threatening for other people." She described the same three events about which she had written in her letter to counsel. She also described non-work incidents, especially about the funeral. After that occurrence, the family insisted she get help. The daughter-in -law helped at Plaintiff's house with cleaning, the checking account, grocery shopping, and helping her with her hair. Plaintiff did not go grocery shopping. She did not got out for family events, including birthdays. She would usually visit on New Years with the family, but only for a very short period of time before she would retreat and get away.

Plaintiff's husband again testified (R. 379). They had been married for 42 years. Every week or two she would threaten "to kill him or something." She could not get along with anybody, and

did not want to be around other people. She would argue with people, tell them they were wrong, and then "start cussing them, and then she'll just leave. She'll just go out of the room. And it's for no reason."

Plaintiff testified that she just did not like being around people. She did not drive anymore. She just wanted to be by herself. She would get angry and throw things, and "get in a fighting mood." She sometimes did not even want to be around her family. Her family did not want her around her new grandchild by herself. When they did visit, she would spend "a few minutes" with them, then go to bed to get away from them.

Plaintiff also testified she could not make a fist with either hand (R. 399). She could hold a knife and fork but it was hard. She could not button buttons.

The ALJ asked the VE if there would be any jobs available for a person of Plaintiff's advanced age at the light exertional level, unskilled and low stress, primarily working with things rather than people. The VE testified there would be a significant number of jobs available. The ALJ then noted Plaintiff's "and the other corroborating testimony about anger outbursts" (R. 406). He asked if Plaintiff's social behavior led to impaired concentration 1/3 to 2/3 of the day, would that affect the work. The VE testified if a person could not stay on task for that amount of time in the workday, she could not sustain any job.

### III. Administrative Law Judge Decision

The ALJ made the following findings:

1.     The claimant has not engaged in substantial gainful activity since the alleged disability onset date.

2.     The claimant has impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

3.   These medically determinable impairments do not meet or medically equal the severity of one of any listed impairment in Appendix 1, Subpart P, Regulation No. 4.

4.   The claimant's allegations regarding her limitations are not totally credible for the reasons set forth above in the body of this decision.

5.   I have considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527 and 416.927).

6.   The claimant has the following residual functional capacity: the claimant can perform light work; her fine manipulative ability is poor; the claimant remains capable of performing entry level, low stress, routine, repetitive, 1 or 2 step jobs which entail working with things rather than with people.

7.   The claimant's past relevant work as a motel housekeeper did not require activity which would be precluded by the claimant's residual functional capacity.

8.   The claimant remains capable of performing her past relevant work.

9.   The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 1520(f)).

(R. 21).

## IV. Contentions

Plaintiff contends:

A.   The ALJ erred by making improper and incomplete credibility findings because he focused on physical impairments which are not the claimant's disabling impairment, by not discussing the credibility of her mental impairments and by failing to make credibility findings for the lay witness testimony which consisted of eyewitness accounts of how the claimant acted on the job.

   1. The ALJ erred when the only reason that he "gave" for making a finding that the claimant's testimony was not fully credible was by evaluating her asthma and symptoms relating to her hands when the claimant's disabling impairment is depression, anxiety, and agoraphobia.

2. The ALJ erred when he did not discuss or evaluate the claimant's testimony about her mental impairments which cause her to become depressed, physically and verbally abusive and cause her to withdraw.

3. The ALJ erred by making no finding about the credibility of her husband and her daughter-in-law that testified to her job performance, to her limited daily activities and to her severely impaired social functioning, that if credited would have required a finding of disability.

B. The ALJ erred by discounting the medical report of the Plaintiff's doctor who has seen her regularly since 1995, who treated her various ailments but in particular her mental impairments and who prescribed medication for her mental illness.

1. The report of her treating physician, Dr. David Bender, that finds the plaintiff has chronic depression that results in a marked restriction of her daily activities, difficulty maintaining social functioning, and affects her concentration is entitled to controlling weight because Dr. Bender has been her doctor for many years, he sees her regularly, he assesses her functioning by talking to her and by his observations of her affect and actions, and he prescribed medication for a mental illness that has been documented for years and most recently by the consultative examiner who diagnosed the plaintiff with panic disorder, agoraphobia, and depression.

2. The ALJ erred by rejecting the treating physician's opinion without giving specific details as to why he was rejecting a treating source that had regularly seen the plaintiff for many years.

Defendant contends:

A.    Substantial evidence supports the ALJ's finding that Plaintiff could perform her past relevant work.

1.    Plaintiff's argument that the ALJ improperly focused on her physical complaints in making his credibility determination and failed to consider the credibility of her mental impairments is without basis.

2.    Although the ALJ did not make specific findings as to the testimony of the witnesses, his decision clearly indicates that he considered the testimony of Plaintiff's husband and daughter-in-law.

24

3.    The ALJ properly considered the opinion of Dr. Bender, but
      gave it less weight in accordance with the regulations.

## V. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated

substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less

than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case

before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.

1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the

Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper

standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an

improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.

1987).

### B. The Grids

As a threshold matter, the undersigned notes that Plaintiff was 56 years old on her alleged

disability onset date and 60 years old at the time of the ALJ's decision.  She was therefore at an

"advanced age" at all times relevant to the decision.  She also has a "limited" education and

unskilled past relevant work.  Under the Medical-Vocational Guidelines --Appendix 2 to Subpart

P of Part 404 ("The Grids"), Plaintiff would therefore be considered disabled if she were limited to work at the sedentary exertional level (Table No. 1 – 201.01), or if it were determined she could work only at the light exertional level and could not perform her "vocationally relevant past work." Id. at 202.00(c). The ALJ determined Plaintiff could work at the light exertional level and could perform her past relevant work as a motel housekeeper, and therefore was not disabled pursuant to the Grids.

### C. Credibility

Plaintiff first argues the ALJ erred when the only reason that he gave for making a finding that the claimant's testimony was not fully credible was by evaluating her asthma and symptoms relating to her hands when her disabling impairments were depression, anxiety, and agoraphobia; erred when he did not discuss or evaluate her testimony about her mental impairments which caused her to become depressed and physically and verbally abusive and caused her to withdraw; and erred by making no finding about the credibility of her husband's and her daughter-in-law's testimony. Defendant contends Plaintiff's argument that the ALJ improperly focused on her physical complaints in making his credibility determination and failed to consider the credibility of her mental impairments is without basis, and although the ALJ did not make specific findings as to the testimony of the witnesses, his decision clearly indicates that he considered the testimony of Plaintiff's husband and daughter-in-law.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)). The Fourth Circuit has developed a two-step process

for determination of whether a person is disabled by pain or other symptoms as announced in Craig

v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically
> determinable impairment which could reasonably be expected to cause not just pain,
> or some pain, or pain of some kind or severity, but *the pain the claimant alleges she*
> *suffers*. The regulation thus requires at the threshold a showing by objective
> evidence of the existence of a medical impairment "which could reasonably be
> expected to produce the actual pain, in the amount and degree, alleged by the
> claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A)
> requires "objective medical evidence of some condition that could reasonably be
> expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective
> medical evidence a medical impairment reasonably likely to cause the pain claimed,
> *that the intensity and persistence of the claimant's pain, and the extent to which it*
> *affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) &
> 404.1529(c)(1). Under the regulations, this evaluation must take into account not
> only the claimant's statements about her pain, but also "all the available evidence,"
> including the claimant's medical history, medical signs, and laboratory findings, *see*
> *id.;* any objective medical evidence of pain (such as evidence of reduced joint
> motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§
> 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of
> the impairment, such as evidence of the claimant's daily activities, specific
> descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20
> C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

Here the ALJ found that Plaintiff had "a panic disorder with agoraphobia, depression,

borderline intellectual functioning and degenerative joint disease; impairments which must be

considered severe." The ALJ then summarized Plaintiff's daughter-in-law's and husband's

testimony, including: Plaintiff had been fired from many jobs due to conflicts; she experienced

verbal outbursts; she often thought everyone was against her; she had physical fights with her

daughters on several occasions; she stayed in the house all day; she got along with no one; she

threatened to kill her husband approximately once a week; she had not consumed alcohol in six

months but her behavior had not changed; and her husband helped with "most everything." The

ALJ summed up Plaintiff's testimony in four sentences: "At the hearing the claimant reported she

had not used alcohol in a year. She does not want to be around people, not even her family. The

claimant asserted she could not make a fist with either hand. Holding a knife and fork was 'hard.'"

> The ALJ's credibility finding, in its entirety, is as follows:

> The claimant's perception that she is disabled is inconsistent with the medical
> evidence. The pain and limitation of function of which the claimant complains are
> in excess of that which would normally be expected to arise from impairments
> manifesting such modest objective clinical findings. Social Security Regulation 20
> CFR 404.1529(c) requires evidence of a medical impairment which could reasonably
> be expected to produce the pain and other symptoms alleged by a claimant. A
> claimant's subjective assertions need not be accepted to the extent they are
> inconsistent with the objective evidence and other evidence (20 CFR 404.1529(c)(4))
> and 416.929(c)(4)). She alleges she is disabled in part by asthma, however, the
> medical evidence does not support the existence of any serious respiratory problem.
> The claimant testified that she could not make a fist, however, when examined by Dr.
> Beard, the claimant could make a fist bilaterally and pick up coins and buttons
> (Exhibit 1F). Her grip strength was reduced but adequate. I cannot find the
> claimant's testimony to be fully credible, and I have treated it accordingly.

(R. 20). The undersigned finds several problems with the ALJ's finding. First, and perhaps most

importantly, although Plaintiff did allege disability in part due to asthma and arthritis, she never

alleged these two impairments were disabling. Her application, dated January 28, 2002, stated her

limitations were due to depression, asthma, high blood pressure, and arthritis (R. 122). She stated

she worked after these conditions first bothered her, but that when she had an asthma attack, other

employees would help. She also stated her depression made it hard for her to get along with co-

workers as well as her husband and children. She thought everyone was against her. She stated she

stopped working in August 2000, because she "could not get along with people [and] was not doing

[her] job because [she] was depressed and afraid to drive" (R. 122). In her Activities of Daily

Living, Plaintiff stated she did not sleep at night and took naps during the day because she just did

not like being awake or around anyone (R. 136). She only left the house to go to the doctor. She did not want to be around anyone, and would "take things the wrong way and get real angry" (R. 139). The ALJ did not discuss the credibility of Plaintiff's alleged mental limitations, despite that it appears they are her main complaint and the reason she stopped working. Second, although Plaintiff had not been hospitalized for asthma, there is evidence in the record that she had at least a history of a severe respiratory impairment. She had been diagnosed with asthma and RAD and COPD in the past. She used inhalers. The undersigned finds the fact that Plaintiff admitted she hadn't had an asthma attack since quitting work does not detract, but adds to her credibility. Third, regarding Plaintiff's arthritis in her hands, it is undisputable that she does have arthritis in her hands. The undersigned does not find dispositive the fact that she could make a fist bilaterally, pick up coins, and button buttons in March 2002, but not in October 2004, more than two and a half years later.

Finally, the ALJ did not state what weight, if any, he accorded Plaintiff's husband's and daughter-in-law's testimony regarding Plaintiff's mental condition. Their testimony corroborated Plaintiff's and each other's. The daughter-in-law had submitted a letter which was also consistent with all the testimony. The daughter-in-law's testimony particularly relevant because she actually worked with Defendant. As provided in Social Security Ruling ("SSR") 85-16:

> Other evidence also may play a vital role in the determination of the effects of impairment. To arrive at an overall assessment of the effects of mental impairment, relevant, reliable information, obtained from third party sources such as social workers, previous employers, family members, and staff members of halfway houses, mental health centers, and community centers, may be valuable in assessing an individual's level of activities of daily living. Information concerning an individual's performance in any work setting (including sheltered work and volunteer or competitive work), as well as the circumstances surrounding the termination of the work effort, may be pertinent in assessing the individual's ability to function in a competitive work environment.

The testimony regarding Plaintiff's mental condition is of great importance in this case because the VE in the first hearing testified that, if the testimony regarding Plaintiff's mood swings and violent attitudes where she would withdraw, decompensate, and go by herself avoiding interacting with people were credible, there would be no jobs (R. 356). This would be so even if the problems happened only once or twice a month, as Plaintiff's husband testified. At the second hearing the ALJ noted Plaintiff's "and the other corroborating testimony about anger outbursts," and asked the VE if Plaintiff's social behavior led to impaired concentration 1/3 to 2/3 of the day, would that affect the work. The VE testified if a person could not stay on task for that amount of time in the workday, she could not sustain the jobs. Therefore, Plaintiff's mental condition alone, if credible, would be disabling.

In order to facilitate review of an ALJ's decision, an ALJ has a duty to explain the weight given to all of the relevant evidence. See Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984)("We cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence."); see also 42 U.S.C. §405(b)(1) (discussing duty of explanation under Social Security Act). Thus, while "the reviewing court should not 'undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of' the agency," Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir.2001), in explaining his credibility determinations, an ALJ should "refer specifically to the evidence informing his conclusion." Hammond v. Heckler, 765 F.2d 424 (4th Cir. 1985). In Smith v. Heckler, 735 F.2d 312 (8th Cir. 1984), the Eighth Circuit addressed the ALJ's treatment of witness testimony as follows:

> We have frequently criticized the failure of the Secretary to consider subjective testimony of the family and others. We have held that a failure to make credibility determinations concerning such evidence requires a reversal and remand. *Basinger v. Heckler*, 725 F.2d 1166, 1169-70 (8th Cir.1984); *see also Simonson v. Schweiker,*

30

699 F.2d 426, 429 (8th Cir.1983) (failure to consider subjective testimony about pain). If the ALJ is to reject such testimony, it must be specifically discussed and credibility determinations expressed. Because the ALJ failed to consider this evidence properly, his decision, and those of the Appeals Council and of the district court that were based upon it, must be reversed.

Here the ALJ failed to explain his reasons for his credibility determination, especially regarding the testimony of Plaintiff's witnesses. While he apparently discredited Plaintiff's testimony based on what he believed was a lack of objective medical evidence regarding her hand and breathing impairments, the two witnesses focused almost entirely on Plaintiff's mental condition. Yet the ALJ failed to indicate whether or not he even found this testimony credible. While there may be legitimate reasons for rejecting the testimony regarding Plaintiff's mental impairments, the undersigned finds the Commissioner must, at the least, articulate those reasons.

### D. Dr. Bender's Opinion

Plaintiff next argues the ALJ erred by discounting the medical report of Dr. Bender, who had seen her regularly since 1995, and who treated her various ailments but in particular her mental impairments. Defendant contends the ALJ properly considered Dr. Bender's opinion, but gave it less weight in accordance with the regulations. In <u>Craig v. Chater</u>, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony 'be given controlling weight.' <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. § 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
> > [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
> >
> > By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial

evidence, it should be accorded significantly less weight.

There is no dispute that Dr. Bender is Plaintiff's treating physician. He has treated her regularly for many years, for all of her impairments, physical and mental. In March 2003, Dr. Bender wrote that "because of [Plaintiff's] multiple medical problems including major depression and degenerative joint disease of her back, she is unfortunately totally and permanently disabled." (R. 246). He also wrote that her poor functioning outside the home necessitated her living "in a highly controlled environment." The undersigned finds these opinions concern issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. Section 404.1527(e)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 404.1527(e)(1). These opinions therefore cannot be accorded controlling weight.

The ALJ discussed Dr. Bender's March 2003 opinion as follows:

> In his March 2003 report at Exhibit 11F, Dr. Bender asserts that the claimant cannot work outside a highly controlled living environment. Yet the claimant has never seen a mental health professional for treatment or counseling. Dr. Bender also asserts that the claimant is unable to engage in work activity because of degenerative joint disease in her back. Yet a March 2003 lumbar spine x-ray was normal . . . . Dr. Bender also makes unsupported assertions in his notes indicating that the claimant is disabled or unable to work. Dr. Bender's opinions are conclusory, poorly supported by the objective medical data and void of rationale. I can give them little weight (see 20 CFR 404.1527).

20 C.F.R. § 404.1527, which the ALJ himself cited, states:

32

(d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. <u>We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.</u>

(i) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided

and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

The undersigned does not find the ALJ's reasons for giving Dr. Bender's opinion little weight are sufficient under the Regulation. First, the lumbar spine x-ray was performed in March 2002, not 2003. Second, Plaintiff consistently complained mostly of pain between her shoulder blades and up to her neck, not in her lumbar spine. Dr. Beard's examination supports Dr. Bender's opinion of at least some back pain. He found Plaintiff had chronic neck and upper back pain and chronic cervicothoracic sprain, and expressly noted that osteoporosis could not be ruled out. Dr. Capage's Mental RFC also supports to a degree Dr. Bender's opinion regarding Plaintiff's mental impairments, in that he found her moderately limited in her ability to understand, remember, and carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public. Further, Plaintiff's explanation for not having gone to a psychologist or psychiatrist instead of Dr. Bender is consistent with her allegations of severe agoraphobia.

This is not to say that Dr. Bender's opinion is entitled to controlling weight or any great weight, only that the ALJ's explanation for according the opinion little weight is insufficient under

the Regulations.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB. I accordingly recommend Defendant's Motion for Summary Judgment [Docket Entry 10] be **DENIED**, and Plaintiff's Motion for Summary Judgment [Docket Entry 9] be **GRANTED,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation..

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this *21* day of April, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE